Filing # 86340668 E-Filed 03/13/2019 03:43:21 PM

IN THE CIRCUIT COURT OF THE
THIRTEENTH JUDICIAL CIRCUIT, IN
AND FOR HILLSBOROUGH COUNTY,
FLORIDA

HILLSBOROUGH COUNTY AVIATION
AUTHORITY, a Florida independent special district

      Plaintiff,

v.                               CASE NO.

TURO INC., a Delaware Corporation,
and multiple unknown JANE and JOHN DOE

      Defendants.

_____/

## **VERIFIED COMPLAINT**

Plaintiff, the HILLSBOROUGH COUNTY AVIATION AUTHORITY ("Aviation Authority"), by and through its undersigned attorneys, sues the Defendants, TURO INC. ("Turo"), a Delaware corporation, and multiple unknown JANE and JOHN DOE (collectively the "Turo Operators") and states:

## **JURISDICTION, PARTIES, AND VENUE**

1.    This is an action for injunctive relief and monetary damages in which the amount in controversy is in excess of $15,000.00 exclusive of interest and costs, an amount within the jurisdiction of this Court by virtue of Section 26.012, Fla. Stat. (2018).

2.    The Court has jurisdiction over this action, which seeks temporary and permanent injunctions to preclude Defendants' continued trespass, damages and an accounting resulting

1

from Defendants' unauthorized commercial ground transportation activity at Tampa International Airport.

3.     Turo is subject to the jurisdiction of this Court because it operates, engages in and/or carries on a business or business venture in the State of Florida (the "State") and because it committed tortious acts within this State pursuant to Section 48.193, Fla. Stat. (2018).

4.     The Aviation Authority is an independent special district validly existing under Chapter 2012-234, Laws of Florida, as amended (the "Act"), which grants the Aviation Authority the exclusive jurisdiction, control, supervision and management over all public airports in Hillsborough County, Florida (the "County"), including the Tampa International Airport.

5.     Defendant, Turo Inc., is a Delaware corporation, with an address of 116 New Montgomery Street, Suite 700, San Francisco, California 94105, that is not registered to do business in the State of Florida. Turo operates a web-based rental car enterprise that collects car rental and related fees from Florida car rental customers, for cars owned by Turo agents, including the Jane and Joe Co-Defendants, which Turo rents through Turo's app and website to car rental customers who are solicited and identified by Turo.

6.     Turo is currently and has at all material times engaged in business in Hillsborough County, Florida, in concert with, as an agent, and affiliate of multiple unknown Jane and John Doe Co-Defendants herein, to arrange for and collect the car rental fees for car rental deliveries and pickups of its Jane and John Doe Co-Defendant agents' rental cars at the Tampa International Airport.

2

7.     The multiple unknown Jane and John Doe Defendants are all unknown Turo agents and affiliates who reside in Hillsborough and neighboring counties, and who have engaged in business in Hillsborough County, Florida with Turo, by delivering and/or picking up rental cars to Turo customers, or conducting other unauthorized commercial ground transportation activities on Tampa International Airport property in exchange for Turo providing rental car advertising, customers and paying Jane and John Doe Co-Defendants a portion of the car rental and related fees collected by Turo through its app and website.

8.     Venue is proper in Hillsborough County, Florida, pursuant to Section 47.051, Fla. Stat. (2018), because multiple Defendants reside in Hillsborough County, Florida, all Defendants do business in Hillsborough County, Florida, and all of the causes of action alleged herein accrued in Hillsborough County, Florida.

9.     The Aviation Authority has retained the undersigned counsel to prosecute this action against the Defendants.

10.    All conditions precedent to the filing of this action have occurred, been satisfied or have been waived.

## BACKGROUND ALLEGATIONS

11.    The Aviation Authority operates the Tampa International Airport (hereinafter referred to interchangeably as the "Airport" or "TPA") in Tampa, Hillsborough County, Florida, pursuant to authority delegated to it by the State.

12.    Pursuant to the Act, the Aviation Authority "shall manage airport facilities and grant airport concessions to further the development of commerce and tourism in or affecting the Tampa Bay area and the [s]tate." 2012 Fla. Laws 234.

3

13.     In managing its facilities and granting concessions for services to the public, the Aviation Authority shall promote the development of commerce and tourism by, among other things, "[l]imiting or prohibiting business competition which is destructive to the ends of promoting commerce and tourism in the state." *Id*.

14.     The Aviation Authority is also the Airport sponsor, as a recipient of financial funding for airport development from the Federal Aviation Administration (the "FAA") under the Airport Improvement Program, authorized by the Airport and Airway Improvement Act of 1982, as amended, 49 USC § 47101, *et seq*.

15.     TPA is an international airport that is, based on passenger traffic, the 4th busiest airport in the State, the 29th busiest airport in the United States, and the 111th busiest airport in the world.

16.     Given the number of individuals who use TPA's roadways and facilities, the Aviation Authority must strictly regulate traffic, parking and business operations on its property to ensure public safety and convenience, to enhance efficiency and productivity at TPA, and to comply with its federal grant obligations.

17.     For this reason, the Aviation Authority, through its Rules and Regulations No. R340 for Tampa International Airport (2017) (the "Rules and Regulations"), Aviation Authority Policy P310: Commercial Ground Transportation (the "Commercial Ground Transportation Policy"), and Aviation Authority Policy P822: Off-Airport Rental Car Companies (the "Off-Airport Rental Car Policy") (collectively referred to herein as the "Regulations"), imposes restrictions on individuals and entities that bring vehicles onto Airport property for commercial purposes, including requiring that such individuals and entities obtain a contract or permit, pay

4

fees, and comply with designated traffic routes and parking requirements, which have all been violated by the Defendants.

18.     Congestion is a particularly serious problem at TPA, given that tens of thousands of vehicles traverse the Airport's roadways and park on Airport property on a daily basis.

19.     The Aviation Authority has attempted to address Airport congestion by opening a Rental Car Center away from the Airport Main Terminal with a dedicated curbside for off-airport rental car companies and by requiring these off-airport rental car companies to pick-up/drop-off customers at the Rental Car Center curbside.

20.     The Aviation Authority monitors and enforces these restrictions through its contract terms and permit requirements.

21.     By requiring that off-airport rental car companies conduct pick-ups and drop-offs in areas other than the Main Terminal curbsides, the Aviation Authority significantly reduces congestion at the Airport Main Terminal for arriving and departing air travelers.

22.     The Airport receives no local tax dollars.

23.     Rental car fees are a major source of income for the Airport.

24.     The Aviation Authority generates significant operating revenue from sources such as rental cars, parking, commercial ground transportation and other user fees, which constituted approximately 46% of TPA's operating budget in Fiscal Year 2017-2018.

25.     There are two types of rental car companies that operate at TPA, each of which is subject to a consistent set of contract/permit and fee requirements.

5

26.     "On-airport" rental car companies obtain a concession through a competitive procurement process to lease physical space on Airport property for the convenience of their customers.

27.     Other companies, called "off-airport" rental car companies, maintain facilities outside Airport property but access Airport travelers and are granted the use of certain designated Airport roadways and operating areas to pick up and drop off their customers.

28.     The Aviation Authority imposes the same basic contract/permit terms and fees on all "on-airport" rental car companies that operate at TPA.

29.     The Aviation Authority imposes the same basic contract/permit terms and fees on all "off-airport" rental car companies that operate at TPA.

30.     This consistent regime preserves fair competition and ensures that individuals and entities that derive commercial benefit from TPA's facilities pay their fair share of maintaining those facilities.

31.     In Fiscal Year 2017-2018, there were eleven rental car companies (representing eighteen rental car brands) that operated at TPA pursuant to valid permits/contracts and paid the applicable fees.

32.     Collectively, those eleven companies paid approximately $43,870,922 in fees to operate at TPA in Fiscal Year 2017-2018.

33.     Defendant, Turo is a web-based rental car enterprise that rents cars owned by Turo affiliates to the car rental customers who are solicited and billed by Turo.

34.     Turo posts available rental cars on its website and mobile application ("app"), provides tailored search functions for prospective renters, receives rental car requests, processes

6

reservations and payments, and retains a percentage of the proceeds from each rental car transaction (usually 25%, depending on the insurance coverage selected).

35.   Turo's website, available at https://turo.com, describes its business as a competitor of "traditional" rental car companies and repeatedly uses phrases like "way better than a rental car," "skip the rental counter" and "not your typical car rental":



36.   In competing with "traditional" rental car companies, Turo claims two distinguishing advantages: lower cost and the convenience of vehicle delivery.

7

37.     Turo's homepage advertises that customers can "bypass the rental counter" and "pick up your rental or get it delivered, wherever you need it, up to 35% less than traditional agencies":

# Way better than a rental car

Bypass the rental counter and book unforgettable cars from friendly locals

THE CAR YOU WANT

Choose from over 800 unique makes and
models from affordable daily drivers to rare
specialty cars.

WHERE YOU WANT IT

Pick up the car or get it delivered, wherever
you need it, up to 35% less than traditional
agencies.

**Book the perfect car**

38.     While Turo does not own its Co-Defendants' vehicles that Turo rents to the public, Turo nonetheless offers a full-service rental car experience comparable to that offered by "traditional" rental car companies.

39.     Turo tells prospective renters on its website, "[w]e'll be here for you every step of the way during your trip," and promises insurance coverage, "24/7 roadside assistance" and "24-hour customer support."

40.     Turo also touts its thorough safety and screening procedures, claiming on its website that "[y]our safety is a top priority." Turo's "Trust and safety" page tells prospective renters, "YOU'RE PROTECTED. Each car on Turo must meet our rigorous eligibility standards for safety, condition, and operations."

8

41.     For its Co-Defendant agents and affiliate car owners, the "Trust and safety" page has a similar message: "YOU'RE SAFE.  We screen each traveler, so you can be confident when you hand over your keys."

42.     Turo's car owners, agents and renters are required to register, reserve the rental cars, and pay Turo on the Turo website or app.

43.     In addition to screening renters, Turo offers car owners a variety of other supportive services, including free professional photography for vehicles and a pricing algorithm designed to maximize profits.

44.     Automobile owners who desire to have Turo rent their cars have an option of setting the daily rental rate or using Turo's automatic pricing option, which sets the car rental price based on market values, location, time of year, and other data used by Turo.

45.     At the time the reservation is made on the Turo website or app, Turo charges the car renter full cost for the car rental transaction by billing the renter's credit card on file in the renter's account on the Turo website or app.

46.     Turo pays its Co-Defendants their portion of the Turo car rentals by direct deposit, initiated by Turo 30 minutes after the rental ends, or if a rental is for more than a week, Turo remits its Co-Defendants' rental car payment at the end of each week.

47.     Consistent with the comprehensive car rental services it offers, Turo carries or enforces a number of standardized umbrella policies that cover all Turo rental transactions.

48.     Turo has detailed "Terms of Service," a cancellation policy, an extension and late return policy, a minimum rental duration, a late fee schedule, a smoking policy, a pet policy, a

9

fuel policy, a toll policy, a security deposit policy, a street parking policy, a nondiscrimination policy, and community guidelines on the Turo website and app.

49.    Turo also has a policy governing the removal of copyrighted material from car listings and reserves the right to modify listings on the app and website at its discretion.

50.    Turo's Co-Defendant car owner agents must comply with Turo's many policies or risk termination from Turo.

51.    Indeed, Turo reserves the right to remove car owners or listings from the app and website for any reason or no reason.

52.    In the event that a vehicle is not returned by the end of the reservation, is found illegally parked, apparently abandoned, or used in violation of applicable law or Turo's Terms of Service, Turo has the option to repossess the vehicle.

53.    In sum, the Turo and its Co-Defendants' rental car experience is standardized and controlled by Turo down to the small details.

54.    Airport car rentals constitute part of Turo's business model and advertising.

55.    On Turo's "How Turo works" page, airport rental car delivery is one of three options provided for Turo and its Co-Defendants' to rent cars using Turo's app and website:

10



56.    In multiple places on its website, Turo affirmatively advertises as an "alternative to airport car rentals" and promotes that Turo's agents deliver rental cars to customers at over 300 airports, including TPA.



11

57.    Turo also emphasizes on its "Owners tools" page that, "One thing that really distinguishes Turo from traditional rental car agencies is the unparalleled convenience of delivery."

58.    In addition to the promotional language on its website, Turo structures its website functions and default options to facilitate car rental transactions at TPA.

59.    For instance, Turo aggregates listings that offer TPA car rental pickups and drop-offs under a single easily searchable tab called "TPA – Tampa International Airport, Tampa, FL."

60.    When prospective car renters in Tampa click the search box on Turo's homepage to input their desired location, a dropdown menu pre-populated by Turo lists "TPA – Tampa International Airport" as one of the suggested locations.

61.    Similarly, Turo promotes its airport delivery option to car renters on its "Tampa" page, which lists "TPA – Tampa International Airport, Tampa, FL" as one of the suggested search options for nearby car rental locations, advises renters to "[s]kip the rental counter" and provides a "search TPA" button.

12



62.     When a prospective car renter selects the suggested search option for "TPA –
Tampa International Airport, Tampa, FL", he or she is directed to a long list of cars available for
rent displayed under the words "Skip the rental counter. 198 cars at TPA – Tampa International
Airport, Tampa, FL". Many of those 198 listings expressly offer delivery to TPA.

63.     Turo further explains the logistics of airport delivery of its advertised car rentals
on the page called: "How does airport delivery work?"

64.     On that page, Turo notes that its Co-Defendant car owner agents and renters often
meet at "the departures curb" or an airport "cellphone lot."

65.     Another option, Turo suggests, is for the car owner to leave the rental car in an
airport parking lot "with a key in a lockbox."

66.     On its website, Turo advertises "car rental alternatives near Tampa International
Airport" and provides reviews by previous renters dating back to December 31, 2017 describing

13

their experiences engaging in rental car transactions through Turo and the Jane and John Doe Co-Defendants at the Airport.

67.     Neither Turo nor any Co-Defendants have obtained a contract or permit as required by the Aviation Authority to conduct commercial rental car or any other commercial ground transportation activities on Airport property, and accordingly both Turo and its Co-Defendants have violated the Aviation Authority's Regulations.

68.     On April 28, 2017, September 18, 2018 and January 9, 2019, the Aviation Authority sent a cease and desist letter to Turo advising that Turo was violating the Aviation Authority's Regulations and was therefore trespassing, a copy of which cease and desist letters are attached hereto as Exhibit "A".

69.     On at least eight occasions between December 3, 2018 and December 5, 2018, Defendants engaged in rental car transactions on Airport property using the Turo website or app.

70.     Of the eight occasions, three (3) involved Turo Operators delivering or picking up rental vehicles curbside at the Airport Main Terminal; two (2) involved Turo Operators delivering and picking up rental vehicles to the Airport passenger in the Short Term Parking Garage; and three (3) involved a parked rental vehicle that was picked-up and returned to the Economy Parking Garage at the Airport, all without a permit or contract with the Aviation Authority, in multiple violations of the Aviation Authority's Regulations.

71.     As set forth herein, the following Regulations provide the framework for required contracts or permits and permissible commercial rental car activities that apply to the Defendants' unauthorized commercial ground transportation operations at the Airport.

14

## THE REQUIREMENTS OF THE AVIATION AUTHORITY'S REGULATIONS

72.     As a recipient of federal funding, the Aviation Authority is obligated to comply with its federal grant assurances and related Federal law, 49 USC § 47107.

73.     Responsibility for monitoring and ensuring airport sponsor compliance with applicable federal obligations is vested in the Secretary of Transportation by 49 USC § 47107 and delegated to the FAA. *See* 49 USC § 47122.

74.     The FAA is authorized to promulgate regulations and issue orders necessary to carry out its obligations under the Federal Aviation Act and the Airport and Airway Improvement Act of 1982. *See* 49 U.S.C. § 40113(a).

75.     FAA Order 5190.6B, Airport Compliance Manual (hereinafter the "FAA's Compliance Manual"), sets forth the policies and procedures for the FAA Airport Compliance Program, which "ensures airport sponsors' compliance with their federal obligations in the form of grant assurances, surplus and nonsurplus obligations, or other applicable federal law." *See* FAA Order 5190.6B, coversheet.

76.     Grant Assurance 19, Operation and Maintenance, requires "the airport and all facilities which are necessary to serve the aeronautical users of the airport. . .shall be operated at all times in a safe and serviceable condition. . . as may be required or prescribed by applicable Federal, state and local agencies for maintenance and operation." *See* Airport Sponsor Assurances (2014).

77.     To comply with its operation and maintenance requirements, the sponsor is required "to protect the public using the airport by adopting and enforcing rules, regulations and ordinances as necessary to ensure safe and efficient flight operations" and "to maintain and

15

operate the aeronautical facilities and common-use areas for the benefit of the public." *See* FAA Order 5190.6B, Section 7.8.

78.     In addition, the State granted the Aviation Authority the power, pursuant to Section 6 of the Act, to "[a]dopt and amend rules, regulations, and policies that are reasonably necessary to implement [the] Act," to "[f]ix, alter, charge, establish, and collect rates, fees, rentals and other charges…for the services of [Aviation] Authority facilities at reasonable and uniform rates," and to "fix and enforce penalties for the violation of the Act or a rule, regulation, or policy adopted in accordance with the Act." *See* 2012 Fla. Laws 234.

79.     Pursuant to the authority granted by the State and to comply with its federal grant obligations, the Aviation Authority adopted the Regulations, which establish a framework for the permit and contract requirements and permissible commercial ground transportation activities at the Airport.

80.     Pursuant to the Commercial Ground Transportation Policy, the purpose of the Aviation Authority's regulation of commercial ground transportation services is to ensure acceptable standards of service to the public; avoid congestion of Airport roadways, curbsides and parking areas; ensure appropriate revenue is received by the Authority from those providing commercial ground transportation services at the Airport; and ensure compliance with the operating procedures for ground transportation and other applicable Airport Rules and Regulations. *See* Commercial Ground Transportation Policy, at 1.

81.     The Commercial Ground Transportation Policy requires that "all commercial ground transportation services regularly serving the [A]irport must show evidence of adequate liability insurance coverage; must operate under the terms of a current contract or permit with the

16

Authority; must park, load and unload passengers only in those areas or locations on the airport specifically designated for such purposes; and must abide by all operating procedures specifically established for commercial ground transportation and all other applicable airport rules and regulations." *See* Commercial Ground Transportation Policy, at 2-3.

82.     The Aviation Authority's Rules and Regulations prohibit a person for any business, commercial, or revenue producing purposes, from conducting any business, commercial enterprise or activity on Airport property without first obtaining a written contract, permit or other form of written authorization from the Aviation Authority. §2.2.

83.     In addition, the Off-Airport Rental Car Policy states "[a]ll off-airport rental car companies deriving income from business generated at the Airport must enter into an agreement with the Authority to perform any portion of their business on the Airport." *See* Off-Airport Rental Car Policy, at 1.

84.     To control and reduce traffic and parking congestion, the Rules and Regulations require that "[a]ll Commercial ground transportation operators and Transportation Network Companies, unless otherwise provided by agreement or permit with the Authority, will only be allowed to deliver customers to the Airport and to meet pre-reserved customers at the Airport in places designated by the Authority." §8.1.

85.     The Aviation Authority "will provide appropriate and convenient facilities to permit the efficient operation of rental cars and other commercial ground transportation vehicles", which will be "consistent with the operational and physical constraints imposed by the limited availability of space at the passenger terminal complex and elsewhere." *See* Commercial Ground Transportation Policy, at 2.

17

86.    In addition, the Aviation Authority "will allocate available vehicle parking, loading and unloading in the transportation centers, and elsewhere for use by commercial ground transportation services". *See* Commercial Ground Transportation Policy, at 3.

87.    The Off-Airport Rental Car Policy further requires "[a]ll off-airport rental car companies will transport their customers to the Airport and meet their customers at the Airport in locations designated by the Authority." *See* Off-Airport Rental Car Policy, at 2.

88.    With regard to fees and charges, the Commercial Ground Transportation Policy provides that "the Aviation Authority will establish and collect fees and charges from the operators of airport commercial ground transportation services to ensure that the Authority generates the appropriate revenue from the provision of these services. In establishing such fees and charges, the Authority will include the recovery of the costs of constructing the facilities used by each ground transportation service, and the Authority's maintenance, operational, administrative, and enforcement costs associated with such facilities." *See* Commercial Ground Transportation Policy, at 3.

89.    The Commercial Ground Transportation Policy fees are important to maintain the Airport's improvements and future financial viability.

90.    The ground transportation fees are also mandated by federal law, which requires that the Aviation Authority adopt "a schedule of charges for use of [its] facilities and services" that renders the Airport "as self-sustaining as possible" as a condition for federal grants. (49 U.S.C. § 47107(a)(13)(A). *See also* 49 U.S.C. § 47101(a)(13) [articulating federal policy that airports be as financially self-sustaining as possible].)

18

91.     49 U.S.C. 47107(l)(1) requires the establishment of policies and procedures to "assure the prompt and effective enforcement" of the revenue use and self-sustainability requirements under 49 U.S.C. § 47107(a)(13)(A) by providing the Secretary of the Department of Transportation with the statutory authority to adopt more detailed guidance on permitted and prohibited uses of airport revenue. *See* 64 FR 7696, 7701.

92.     Accordingly, the FAA's Compliance Manual requires that "[r]ates charged for nonaeronautical use of the airport must be based on fair market value," which "can be determined by reference to negotiated fees charged for similar uses of the [A]irport". *See* FAA Order 5190.6B, 17.11 and 17.12.

93.     The Aviation Authority's Off-Airport Rental Car Policy states that "Off-Airport rental car agreements will establish fees due to the [Aviation] Authority for the right to do business on the Airport." *See* Off-Airport Rental Car Policy, at 1.

94.     Each off-airport rental car company is required to pay the Aviation Authority a Transportation Facility Charge, Privilege Fee, and Per-Trip Fees. *See* Off-Airport Rental Car Policy, at 1-2.

95.     Pursuant to the Aviation Authority Resolution No. 2014-37, all off-airport rental car companies are required to pay the Aviation Authority a Transportation Facility Charge in the amount of $2.00 per rental transaction day (i.e. each 24-hour period), effective beginning on April 1, 2014.

96.     The Aviation Authority "may also charge a privilege fee representative of the special benefit a particular class of business derives from the airport and its use thereof." *See* Commercial Ground Transportation Policy, at 3.

19

97.     The Privilege Fee is "a set percentage of the gross receipts received by the off-airport rental car company from Airport generated business." *See* Off-Airport Rental Car Policy, at 1.

98.     Each off-airport rental car company was required to pay Privilege Fees in the amount of 8.5% of gross receipts from October 1, 2016 to February 13, 2018, and 9% of gross receipts beginning February 14, 2018. *See* Use and Permit Agreement for Off-Airport Rental Car Concessions, Section 5.01.

99.     In addition, an off-airport rental car operator is assessed Per-Trip Fees for each time its vehicles enter the Airport property and pick-up one or more Airport customers. *See* Use and Permit Agreement for Off-Airport Rental Car Concessions, Section 2.05.

100.    Each off-airport rental car company will pay a Per Trip Fee of $2.50 per trip during the first year of an operator's agreement, $3.50 per trip during the second year of the agreement, and $4.50 per trip during the third year of the agreement. *See* Use and Permit Agreement for Off-Airport Rental Car Concessions, Section 5.04, effective beginning on August 1, 2017.

## DEFENDANTS' COMMERCIAL GROUND TRANSPORTATION OPERATIONS UNDERMINE THE LEGITIMATE PUBLIC INTEREST PURPOSES OF THE REGULATIONS

101.    By not obtaining a required contract or permit from the Aviation Authority and violating the Regulations, Defendants undermine the Aviation Authority's objective of providing ground transportation services consistent with public safety.

102.    To promote the efficient movement of passengers to and from the Airport, the Commercial Ground Transportation Policy states that Aviation Authority will provide a system

20

where commercial ground transportation operators pick up and drop off passengers at the Airport.

103.    Rental car companies are prohibited from conducting commercial ground transportation services curbside at the Main Terminal at TPA, in order to provide less congestion for the primarily non-commercial private vehicles.

104.    By funneling commercial ground transportation activity to the Rental Car Center, Airport Quad Lots, and elsewhere, the Aviation Authority reduces congestion and other adverse impacts to the limited curbside space available at the Main Terminal, where passengers need access to be picked up or dropped off safely by friends and family.

105.    Defendants have undermined the efficiencies of the Aviation Authority's traffic flow system by conducting their commercial ground transportation operations curbside at the Main Terminal, in parking garages at the Airport, and in other areas of the Airport where commercial rental car activity is prohibited, thereby increasing congestion and impairing the efficient movement of passengers, in violation of the Aviation Authority's Regulations.

106.    The Aviation Authority also seeks to provide fair, respectful competition among providers of ground transportation services and to comply with the Federal Grant Assurances requiring it to operate the Airport safely and in a self-sustaining manner, pursuant to Federal law.

107.    An objective of the Commercial Ground Transportation Policy is to avoid "destructive competition which would impair the quality of services to the public or lead to uncertainty, disruption or instability of commercial ground transportation services at the airport." *See* Commercial Ground Transportation Policy, at 2.

21

108.    Defendants' failure to obtain a contract or permit and follow the Aviation Authority's Regulations allows Defendants to unfairly undercut the prices of authorized commercial ground transportation operators, allows Defendants to obtain a non-monetary competitive advantage by operating at the Airport in areas where other commercial ground transportation operators that must comply with the Aviation Authority's Regulations cannot, and hinders the Aviation Authority's ability to be self-sustaining and conduct safe and efficient airport operations.

109.    Defendants have utilized the passenger parking garages and parking lots on Airport property to park rental cars for their commercial purposes, which interferes with the Aviation Authority's efforts to make adequate parking available for Airport passengers.

110.    Defendants' continued trespasses at the Airport to conduct unauthorized commercial ground transportation operations on Airport property undermines the objectives of the Aviation Authority's Regulations, jeopardizes the Airport's federal funding by preventing the Aviation Authority from complying with its federal grant obligations, and gives rise to an irreparable harm with no adequate remedy at law, which cannot be solely remedied by money damages.

111.    The injury to the Aviation Authority consists of the breakdown of its ground transportation system, violation of its federal grant obligations, and loss of revenue, which outweighs any potential harm to the Defendants if they are prohibited from entering Airport property without first complying with the same operational, fee, and reporting requirements that apply to all other commercial ground transportation operators at the Airport.

22

112. As a result of the Defendants' failure to comply with the Aviation Authority's Regulations, the Aviation Authority lacks the information required to quantify all of Turo and the Turo Operators' violations of the Regulations to calculate the resulting damages.

113. Defendants' continued trespasses to conduct unauthorized commercial ground transportation operations at the Airport undermines the fair, competitive environment required by the Regulations, avoids compliance with the safety, traffic and parking regulations established by the Regulations, and unfairly takes business from authorized commercial ground transportation operators who are incurring costs to comply with the governing Regulations, thereby reducing the revenues the Aviation Authority collects and frustrating multiple other non-revenue objectives of the Aviation Authority's Regulations.

114. Authorized commercial ground transportation operators may avoid servicing the Airport if the Defendants are allowed to continue trespassing at the Airport and violating the Regulation's operating and fee requirements to obtain these unfair competitive advantages in violation of the Aviation Authority's Regulations.

## COUNT I- VIOLATION OF THE REGULATIONS AGAINST DEFENDANTS
### (Preliminary and Permanent Injunctive Relief)

115. The Aviation Authority reincorporates the allegations contained in paragraphs 1 through 114 as set forth more fully herein.

116. The Aviation Authority is empowered to enforce the Regulations in order to ensure the objective to promote high quality and reasonably priced ground transportation services, while also maintaining public safety, traffic flow, parking and convenience, to ensure the efficient movement of passengers to and from the Airport, to foster respectful competition

23

among providers of ground transportation services, and to develop revenues for support of the Airport.

117.   Defendants have no right to conduct their car rental business at the Airport for commercial gain in violation of the Aviation Authority's Regulations, and to hold themselves out to the public as providing commercial rental car services at the Airport without first complying with the requirements of the Regulations.

118.   Defendants continued unauthorized commercial ground transportation operations at the Airport undermine the objectives of the Regulations and give rise to an irreparable harm with no adequate remedy at law, which cannot be entirely remedied by money damages.

119.   The public interest would be served by preliminary and permanent injunctive relief prohibiting Defendants from conducting unauthorized commercial ground transportation operations at TPA until such time as they comply with the requirements of the Regulations.

120.   The potential harm to Defendants from the issuance of preliminary and permanent injunctive relief is outweighed by the public interest and the Aviation Authority's duty to meet the objectives of Ch. 2012-234, Laws of Florida, the Rules and Regulations, the Commercial Ground Transportation Policy, and other State and Federal regulations through its enforcement of the Regulations.

121.   Wherefore, the Hillsborough County Aviation Authority demands judgment in its favor in which the Court grants it preliminary and permanent injunctive relief (a) enjoining Defendants and/or anyone acting or purporting to act on their behalf or in concert with them from entering upon Airport property to conduct unauthorized commercial ground transportation operations; and (b) enjoining Turo from offering, contracting with or charging anyone to rent any

24

car for delivery or pick-up at TPA on the Turo app or website until such time as Defendants comply with the provisions of the Regulations.

## COUNT II-TRESPASS AGAINST DEFENDANTS
### (Action for Injunctive Relief and Damages)

122.     The Aviation Authority reincorporates the allegations contained in paragraphs 1 through 114 as set forth more fully herein.

123.     Turo, by directing and acting in concert with its agents, the Turo Operators, has committed trespasses at the Airport by conducting unauthorized commercial ground transportation operations at the Airport, in violation of the Regulations.

124.     Defendants' trespasses by conducting unauthorized commercial ground transportation operations have damaged the Aviation Authority by thwarting both non-monetary and monetary objectives of the Regulations.

125.     Defendants' trespasses by conducting unauthorized commercial ground transportation operations at the Airport undermine the objectives of Ch. 2012-234, Laws of Florida, the Aviation Authority's Regulations, and other State and Federal regulations, and give rise to an irreparable harm with no adequate remedy at law, which cannot be solely remedied by money damages.

126.     The public interest would be served by preliminary and permanent injunctive relief prohibiting Defendants from conducting unauthorized commercial ground transportation operations without complying with the provisions of the Regulations.

25

127. The potential harm to Defendants from the issuance of preliminary and permanent injunctive relief is outweighed by the public interest and the Aviation Authority's duty to meet the objectives of the Regulations.

128. As a result of Defendants' violations of the Regulations while trespassing on the Airport, the Aviation Authority has suffered damages from the loss of revenue it would have otherwise received from the ground transportation services being provided by authorized rental car operators, as well as the non-monetary damages alleged herein.

129. For each Defendants' rental car and passenger ground transportation transactions, the Aviation Authority did not receive the Transportation Facility Charge of $2.00 per rental transaction day, Privilege Fees based on the applicable percentage of off-airport rental car operator's gross receipts, and the Per Trip Fees in the amount of $2.50 for the first year Turo operated at the Airport, $3.50 for the second year, and $4.50 for the third year.

130. As a result of Defendants' failure to comply with the requirements under the Aviation Authority's Regulations, the Aviation Authority lacks the information required to quantify all of the Defendants' violations of the Regulations to calculate the resulting damages.

131. Wherefore, the Hillsborough County Aviation Authority demands judgment in its favor and against Defendants in which the Court grants it preliminary and permanent injunctive relief and damages as follows: (a) enjoining Defendants and/or anyone else acting or purporting to act on their behalf or in concert with them from entering upon the Airport property to conduct unauthorized commercial ground transportation operations; (b) enjoining Turo from offering, contracting with or charging anyone to rent any car for delivery or pick-up at TPA on the Turo

26

app and website; and (c) awarding damages, costs, pre-judgment interest and any other and further relief as the Court deems just and equitable.

## COUNT III-CIVIL CONSPIRACY AGAINST DEFENDANTS
### (Action for Damages)

132.    The Aviation Authority reincorporates the allegations contained in paragraphs 1 through 114 as though set forth more fully herein.

133.    This is an action for civil conspiracy against Turo and the Turo Operators.

134.    Turo and the Turo Operators agreed with each other and acted in concert to enter Airport property to deliver, park and pick up rental cars and passengers at the Airport for compensation in violation of the Regulations and to conduct unauthorized commercial ground transportation operations.

135.    Defendants have been advised that their actions were violating the Aviation Authority's Regulations.

136.    The Defendants, in concert with another, engaged in the following overt acts.

137.    The Defendants conducted unauthorized commercial ground transportation operations at TPA for their pecuniary benefit and financial gain.

138.    Turo, through its agents, the Turo Operators, directed Airport passengers who used the Turo website or app to engage in rental car transactions on Airport property with the Turo Operators notwithstanding Turo's actual knowledge that such unauthorized commercial ground transportation operations were in violation of the Aviation Authority's Regulations.

139.    The Aviation Authority has been damaged as a result of the Defendants' actions.

27

140.    Wherefore, the Hillsborough County Aviation Authority demands judgment in its favor and against Defendants for damages, costs, pre-judgment interest and any other and further relief as is deemed just and equitable.

## COUNT IV-AIDING AND ABETTING TRESPASS AGAINST TURO
### (Action for Injunctive Relief and Damages)

141.    The Aviation Authority reincorporates the allegations contained in paragraphs 1 through 114 as though set forth more fully herein.

142.    This is an action for aiding and abetting a trespass against Turo.

143.    Turo, at all material times, was and is aware of the prohibitions against unauthorized commercial ground transportation operations at the Airport.

144.    Turo, at all material times, was and is aware the Regulations require that everyone that conducts commercial ground transportation operations at the Airport must comply with the Aviation Authority's Regulations.

145.    Turo, by creating and operating its Turo app and website, aided and abetted the Turo Operators in trespassing on Airport property to conduct unauthorized commercial ground transportation operations.

146.    Turo aided and abetted the trespass by the Turo Operators by facilitating the rental car transactions on Airport property with Airport passengers who used the Turo website or app to obtain rental cars at the Airport from Turo through the Turo Operators, notwithstanding Turo's actual knowledge that such rental car transactions were unauthorized commercial ground transportation operations that violated the Regulations.

28

147. Turo benefitted financially from the violations of the Regulations and trespasses by the Turo Operators, which Turo aided and abetted by collecting the car rental fees generated by Defendants' unauthorized trespasses.

148. As a result of Turo's actions, the Aviation Authority has suffered monetary and non-monetary damages.

149. As a result of Turo's violations of the Regulations, while aiding and abetting the Turo Operators' trespasses at the Airport, the Aviation Authority has suffered damage from the loss of revenue it would have otherwise received from the commercial ground transportation services being provided by authorized commercial ground transportation operators.

150. Turo's aiding and abetting the Turo Operators' unauthorized commercial ground transportation operations have also damaged the Aviation Authority by thwarting the non-monetary objectives of the Regulations.

151. Turo's aiding and abetting the Turo Operators' continued trespasses by conducting unauthorized commercial ground transportation operations at the Airport undermines the objectives of the Regulations and gives rise to an irreparable harm with no adequate remedy at law, which cannot be solely remedied by money damages.

152. The public interest would be served by preliminary and permanent injunctive relief prohibiting Turo from aiding and abetting the Turo Operators' continued unauthorized commercial ground transportation operations at the Airport without complying with the requirements of the Regulations.

29

153. The potential harm to Turo from the issuance of preliminary and permanent injunctive relief is outweighed by the public interest and the Aviation Authority's duty to meet the objective of the Regulations.

154. Wherefore, the Hillsborough Aviation Authority demands judgment in its favor and against Turo in which the Court grants preliminary and permanent injunctive relief and damages as follows: (a) enjoining Turo and/or anyone acting or purporting to act on its behalf or in concert with it from entering upon the Airport property to conduct unauthorized commercial ground transportation operations; (b) enjoining Turo from offering, contracting with or charging anyone to rent any car for delivery or pick-up at TPA on the Turo app and website; and (c) awarding damages, costs, pre-judgment interest and any other and further relief as the Court deems just and appropriate.

## COUNT V-UNJUST ENRICHMENT AGAINST TURO
### (Action for Damages)

155. The Aviation Authority reincorporates the allegations contained in paragraphs 1 through 114 as though set forth more fully herein.

156. This is an action for unjust enrichment against Turo.

157. Turo has accepted, retained, and/or enjoyed the benefit of conducting unauthorized commercial ground transportation operations under circumstances that make it inequitable and unjust for the Turo to do so without paying the Aviation Authority for the value of such benefits.

158. As a result of Turo's failure to obtain a contract or permit and comply with the Aviation Authority's Regulations, the Aviation Authority lacks the information required to

30

quantify all of Turo's unauthorized commercial ground transportation operations at the Airport in violation of the Regulations to calculate the resulting fair market value of the damages.

159.    Turo has failed to pay the Aviation Authority the Transportation Facility Charges, Pre-Trip Fees, and Privilege Fees, which establish the market value of the benefits that Turo has obtained but not paid for.

160.    For all Turo rental transactions that have occurred since Turo began operations at the Airport, the Aviation Authority did not receive the Transportation Facility Charge of $2.00 per rental transaction day, Privilege Fees based on the applicable percentage of off-airport rental car operator's gross receipts, and the Per Trip Fees in the amount of the $2.50 for the first year Turo operated at the Airport, $3.50 for the second year, and $4.50 for the third year, which are the reasonable market value of utilizing the Airport's property for commercial ground transportation activities.

161.    Wherefore, the Hillsborough County Aviation Authority demands judgment in its favor and against Turo for damages, costs, pre-judgment interest, and any other and further relief as is deemed just and equitable.

## COUNT VI-ACCOUNTING AGAINST DEFENDANTS

162.    The Aviation Authority reincorporates the allegations contained in paragraphs 1 through 114 as though set forth more fully herein.

163.    This is an action for an accounting with respect to the revenues earned by the Defendants and the additional fees that they owe the Aviation Authority with respect to the unauthorized commercial ground transportation operations conducted at the Airport.

31

164.    As a result of the Defendants' violations of the Regulations while trespassing on Airport property, the Aviation Authority has suffered damages from the loss of revenue it would have otherwise received from the commercial ground transportation services provided by the Defendants.

165.    Because the Defendants have failed to comply with the Regulations by engaging in commercial ground transportation operations without the required contract or permit from the Aviation Authority, the amount of damages are uncertain and the Aviation Authority is entitled to an accounting from Turo and the Turo Operators to determine the number of trips, the rental car revenue from Airport operations, the number of Turo vehicles that have trespassed on the Airport, and the ground transportation revenues owed to the Aviation Authority resulting therefrom.

Wherefore, the Hillsborough County Aviation Authority demands judgment in its favor and against the Defendants in which the Court orders an accounting from Turo identifying all Jane and John Doe Defendants who have violated the Regulations by engaging in unauthorized commercial ground transportation operations at TPA, listing their Airport pickups, drop-offs, and revenues to determine the appropriate fees that the Defendants should have paid the Hillsborough County Aviation Authority pursuant to the Regulations, and for any other and further relief as is deemed just and appropriate.

Dated this  13th  day of  March  , 2019.

32

/s/ Keith A. Graham

Keith A. Graham
Florida Bar No. 0705314
Marchena and Graham, P.A.
976 Lake Baldwin Lane, Suite 101
Orlando, Florida 32814
Telephone No.: (407) 658-8566
Facsimile No.: (407) 281-8564

Attorney for Hillsborough County
Aviation Authority

33

## **VERIFICATION**

The undersigned, David Scott Knight, being over 18 years only and of sound mind, based on his

personal knowledge obtained as the Aviation Authority's Assistant General Counsel, verifies that

the preceding allegations are true and accurate.

By: David Scott Knight
Title: Assistant General Counsel
Hillsborough County Aviation Authority

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

    The foregoing instrument was acknowledged before me this 13th day of March, 2019
by David Scott Knight as Assistant General Counsel for Hillsborough County Aviation Authority,
who is personally known to me or who has produced _____N/A_____ as identification.

Printed Name:
Notary Public
My Commission Expires:

JANET M. WOOD
MY COMMISSION # GG 062255
EXPIRES: March 28, 2021
Bonded Thru Budget Notary Services

34